UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAMELA E. RIVERA,                    :
                                     :CIVIL ACTION NO. 3:17-CV-1221
          Plaintiff,                 :
                                     :(JUDGE CONABOY)
          v.                         :
                                     :
NANCY A. BERRYHILL,                  :
Acting Commissioner of               :
Social Security,                     :
                                     :
          Defendant.                 :
                                     :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Acting Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Doc. 1.) Plaintiff filed an application for benefits on October 2, 2013, alleging a disability onset date of September 23, 2013. (R. 18.) After she appealed the initial denial of the claim, Administrative Law Judge ("ALJ") Theodore Burock held a hearing on October 13, 2015. (*Id.*) With his Decision of December 2, 2015, the ALJ determined that Plaintiff had not been under a disability as defined in the Social Security Act from October 2, 2013, through March 31, 2015, the date last insured. (R. 28.) Plaintiff requested review of the Decision by the Appeals Council and the Appeals Council denied review on June 7, 2017. (R. 1-7.) With the Appeals Council denial, the ALJ's Decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on July 12, 2017. (Doc. 1.) In

her supporting brief, Plaintiff asserts the ALJ erred on the following bases: 1) he improperly based Plaintiff's residual functional capacity ("RFC") on his own lay opinion; 2) substantial evidence does not support the ALJ's RFC assessment; 3) the ALJ erred in his evaluation of Plaintiff's symptoms; and 4) the ALJ erred at step three of the evaluation process by finding that Plaintiff does not meet Listing 12.04. (Doc. 9 at 1-2.) After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

Plaintiff was fifty-two years old on the date last insured. (Doc. 9 at 2 (citing R. 26).) She has a high school education and past relevant work as a home attendant and night auditor. (*Id.*) In a Disability Report dated October 22, 2013, Plaintiff identified the following conditions that limited her ability to work: respiratory problems; PTSD due to domestic violence; COPD; depression; irritable bladder syndrome; and an inability to keep weight up. (R. 162.)

### A. Medical Evidence

Plaintiff had a psychiatric evaluation by Shiv Aggarwal, M.D., at Holy Spirit Hospital on August 13, 2012. (R. 244-46.) The reason for the evaluation was that Plaintiff had been having some problems with depression and PTSD due to past abuse. (R. 244.) Dr. Aggarwal noted that stressors for Plaintiff's symptoms included

"financial problems, having no job, supporting herself by cleaning houses and on food stamps. She has also been having a lot of health problems including hepatitis C, going through menopausal changes, and a chronic cough. She also has no support system." (*Id.*) Dr. Aggarwal reported that Plaintiff had an extensive history of drug and alcohol abuse but, at the time of her evaluation, she was clean from doing drugs except for cannabis and she denied abusing alcohol. (*Id.*) Plaintiff had begun taking psychotropic medications four months earlier and had some side effects including constipation. (*Id.*) Plaintiff had not received previous mental health treatment other than being in a battered women's group many years earlier. (R. 245.) Mental status examination showed the following: Plaintiff was oriented to person, place, date, month, and year; she had fairly good eye contact; her mood appeared to be depressed and anxious; her affect was labile; her thinking was clear; she denied any hallucinations or delusions (however she reported sometimes seeing shadows walking in her room and waking up during her sleep); she had some flashbacks and nightmares from past abuse issues; there was no evidence of any other cognitive deficit; her insight and judgment remained fair; and she denied current suicidal thoughts, plans, or intent. (*Id.*) Dr. Aggarwal diagnosed chronic PTSD, recurrent major depressive disorder, continuous cannabis abuse, and a history of polysubstance abuse. (*Id.*) He recommended that Plaintiff continue with

outpatient psychotherapy and he altered her medication regimen. (R. 246.)

Plaintiff continued to receive mental health treatment at Holy Spirit Hospital through October 2013. Shortly before the alleged September 23, 2013, onset date, Plaintiff reported that she was doing well except for panic attacks and her medications were helping. (R. 234.) The following month, Plaintiff reported that she had been diagnosed with emphysema and a lung mass for which she was going to have a PET scan. (R. 233.) She said she had heightened anxiety and agitation, she was very frightened, and she had suicidal thoughts but would never do that. (*Id.*) CRNP Mary Rock's recorded impression was acute stress related to lung cancer and she planned to refer Plaintiff for counseling. (*Id.*)

Medical records show that primary care providers at Hamilton Health Center referred Plaintiff for evaluation of a lump on her right shoulder and lung nodule in September 2013. (R. 274-75.) On October 1, 2013, she was evaluated at Penn State Hershey Medical Center and the provider advised that the lung nodule should be evaluated more fully prior to intervention on her right shoulder mass. (R. 259.) On October 22, 2013, Plaintiff had a PET scan. (R. 256-58.) The Impression included a right upper lobe pulmonary nodule concerning for primary lung malignancy. (R. 258.)

On October 25, 2013, spirometry showed mild obstructive ventilatory defect without significant bronchodilator effect, lung

volumes not consistent with restrictive ventilatory defect, moderately impaired diffusion capacity, and resting room air SpO2 of 95%. (R. 252.)

A Hershey Medical Center Operative Report indicates that Jennifer W. Toth, M.D., was the chief surgeon for a hybrid procedure including bronchoscopy, endobronchial ultrasound, and a right upper lobectomy which was performed on November 21, 2013. (R. 299.) The postoperative diagnosis was COPD, adenocarcinoma of the right upper lobe, and heavy tobacco use. (*Id.*)

On February 21, 2014, Plaintiff was seen for a regular visit at Holy Spirit Hospital Behavioral Health Services by Mary Rock, CRNP. (R. 592.) Ms. Rock reported Plaintiff's hygiene to be fair, her motor behavioral restless, and her mood anxious but the rest of the mental evaluation was normal. (*Id.*)

At a follow-up with Dr. Toth in March 2014, Plaintiff stated that she had not been doing well: she had recent issues with fatigue and a productive cough; she had chronic pain from the surgery and continued to take OxyContin, Naprosyn, and gabapentin; she used Spireva and an albuteral inhaler; and she asked about a nebulizer. (R. 420.) Dr. Toth noted that Plaintiff was in the process of trying to qualify for disability and asked about her lung condition. (*Id.*) Dr. Toth told Plaintiff her numbers did not meet the criteria for pulmonary disability. (*Id.*)

On March 4, 2014, Michael Rosenberg, M.D., saw Plaintiff for

an internal medicine examination at the request of the Bureau of Disability Determination. (R. 353.) By history, Dr. Rosenberg noted that Plaintiff had been diagnosed with lung cancer and COPD in October 2013, that Plaintiff did not need radiation or chemotherapy for the cancer, and she continued to have chest wall pain that radiated up to the right shoulder which she rated at eight of ten. (*Id.*) Plaintiff also complained of shortness of breath which she felt had been getting worse and was brought on by exposure to cold, exercise, and exposure to dust. (*Id.*) Dr. Rosenberg also noted Plaintiff's history of depression and PTSD with associated panic attacks and nightmares. (*Id.*) Regarding activities of daily living, Dr. Rosenberg recorded that Plaintiff was able to cook once a day, clean, do laundry and shop with help. (R. 354.) He noted that help was needed because Plaintiff was told not to lift anything over five pounds. (*Id.*) Physical examination findings included the following: mild right chest wall pain and right shoulder pain; significant shortness of breath during examination and inability to hold breath for more than five to ten seconds; normal gait and stance; pain with range of motion of cervical spine but full range of motion; single leg raise negative bilaterally; pain with movement of right shoulder elicited right shoulder pain and chest wall pain; and decreased range of motion of right shoulder related to shoulder and chest wall pain. (R. 355-56.)

On March 7, 2014, Plaintiff had a lumbosacral spine x-ray. (R. 357.) The impression was "negative study." (*Id.*)

At an April 15, 2014, counseling session with Angelica Lopez-Heagy at Hamilton Health, Plaintiff reported some improvement in her mood since being put back on her full medication dosage and noted some progress with her anxiety. (R. 543.) Plaintiff also reported that she was attempting to socialize more with church activites. (*Id.*) Later in April, Plaintiff told Ms. Lopez-Heagy that she had increased outside activity and was spending more time with neighbors and gardening which had a calming effect and helped lessen anxiety. (R. 542.) Plaintiff said she did not feel that her psychiatric medications were working as effectively as before, and Ms. Lopez-Heagy suggested she talk with her psychiatrist about this. (*Id.*)

In May 2014, Plaintiff reported to Ms. Lopez-Heagy that her depression was better and she continued to engage in more outside activities. (R. 541.) Plaintiff also reported that her anxiety had not improved and she continued to have panic attacks at times. (*Id.*) Plaintiff was unable to identify specific triggers other than social situations but planned to start a log to try to identify them. (*Id.*) Ms. Lopez-Heagy noted that Plaintiff was alert and oriented times three and her mood and affect were appropriate. (*Id.*)

In July 2014, CRNP Rock's mental status examination of

Plaintiff showed normal findings except for the notation that Plaintiff had mild depression. (R. 590.) Plaintiff reported sleeping a lot and Ms. Rock planned to decrease the Prozac dosage because of sedation. (*Id.*)

In August 2014, Plaintiff reported at a Hamilton Health primary care visit that she was doing a little better regarding her depression. (R. 536.) She also said she was planning to go on a camping vacation. (*Id.*)

In September 2014, Plaintiff had another follow-up appointment with Dr. Toth. (R. 412.) Plaintiff continued to have a persistent cough which increased when she would lie flat, and she complained of associated shortness of breath mainly with exertion when she goes up stairs carrying something. (*Id.*) Other than these problems and chronic ear infections related to a perforated eardrum for which she had just been prescribed an antibiotic, Plaintiff reported that she had been doing well. (*Id.*) Physical examination was not remarkable. (R. 413.) A CT scan performed on the same date showed that opacities that were seen previously were much improved and the right subpleural nodule was no longer appreciated as on the previous study. (*Id.*) Dr. Toth noted that "[o]verall, the CT scan demonstrates improvement and no evidence of recurrence of disease." (*Id.*) Dr. Toth also noted that Plaintiff's pulmonary function testing was improved compared to her March 2014 office visit with the addition of bronchodilators and Spireva. (*Id.*) Dr.

Toth prescribed a new nebulizer machine and planned to follow up in six months. (*Id.*)

At her October and December 2014 visits with CRNP Rock, Plaintiff's mental status examinations were normal. (R. 589, 594.)

At her December 8, 2014, primary care visit, Plaintiff reported that she had been getting very discouraged two weeks earlier because her mood and medical problems were not improving, she had stopped taking all medications the previous week, she was very stressed because a couple of friends had passed away over the past year, she was behind on her rent, and she had no money coming in. (R. 530-31.) Reporting a worsening mood, Plaintiff did not want to get out of bed and was constantly tired. (R. 531.) Plaintiff restarted her medications on December 9, 2014. (R. 589.)

In February 2015, Plaintiff's mental status examination was again completely normal. (R. 595.) CRNP Rock noted that Plaintiff was stressed because of finances including back rent and a large medical bill which she was unable to pay. (*Id.*) Ms. Rock also noted that Plaintiff felt her medications were helping. (*Id.*)

A March 17, 2015, chest x-ray showed postsurgical changes in the right upper lobectomy with no evidence of recurrent disease. (R. 397.)

At a follow-up visit with Dr. Toth on the same date, Plaintiff complained of worsening shortness of breath with an increased need for the albuterol inhaler. (R. 407.) She also complained of a

continuing cough and reported that she smoked at least three to four cigarettes daily. (*Id.*) Dr. Toth noted that "[a] complete 12-point review of systems was performed and is negative except as noted above." (*Id.*) She further noted that Plaintiff's pulmonary function test "appeared to be stable since March 2014." (R. 408.) Dr. Toth adjusted Plaintiff's medication regimen and planned to see her again in six months. (*Id.*)

At her April 2015 visit with CRNP Rock, Plaintiff reported that she was "fighting disability, she could not work, and she had a lawyer helping her." (R. 591.) In her mental status check, Ms. Rock noted that Plaintiff's appearance was normal and her exam was normal except for a depressed mood. (*Id.*) She continued to diagnose Plaintiff with major depressive disorder, recurrent and severe. (*Id.*)

In May 2015, Ms. Rock recorded a completely normal mental status exam. (R. 588.) She noted that Plaintiff felt her medications were helping and she denied depression. (*Id.*) Ms. Rock planned to see Plaintiff again in three months. (*Id.*)

In a June 2015 visit to Hamilton Behavioral Health, Plaintiff reported frustration about her Social Security appeal and discussed stressors related to finances. (R. 526-27.) The provider noted that Plaintiff said she was working on pleasurable activities instead of negative thinking. (R. 527.) In July and August, Plaintiff continued to report depression and anxiety related to

health and financial issues.  (R. 520, 522.)  At her August visit, the provider noted that Plaintiff's smoking had increased ahd she was forgetting to take her medications.  (R. 520.)

In September 2015, Plaintiff reported to CRNP Rock that she had increased anxiety and Ms. Rock noted fair hygiene and slight restlessness.  (R. 587.)  Mental status check was otherwise unremarkable.  (*Id.*)

**B. *Opinion Evidence***

**1.   State Agency Mental Opinion**

State agency psychological consultant Thomas Fink, Ph.D., reviewed Plaintiff's records and completed a Psychiatric Review Technique ("PRT") assessment on December 18, 2013.  (R. 78-79.) Dr. Fink found Plaintiff's affective disorders to be non severe and considered Listings 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), and 12.09 (Substance Addiction Disorders).  (R. 79.)  He determined that Plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration.  (*Id.*)  Dr. Fink's "Additional Explanation" included the notation that Plaintiff's "recent mental status reports indicate she is significantly improved and stable. She remains alert, oriented, nonpsychotic and cognitively intact." (*Id.*)

## 2.  Consulting Examiner Opinion

Michael Rosenberg, M.D., examined Plaintiff on March 4, 2014, and completed a Medical Source Statement of Ability to Do Work-related Activities (Physical).  (R. 358-63.)  He opined that Plaintiff could never lift or carry any weight because the Plaintiff informed him that her surgeon told her not to lift anything greater than five pounds.  (R. 358.)  He further opined that Plaintiff could sit, stand, and walk for four hours at one time without interruption and she could do these activities for a total of eight hours in an eight-hour workday.  (R. 359.)  Dr. Rosenberg concluded that Plaintiff could reach and push/pull frequently with her right hand and continuously with her left hand; she could handle, finger, and feel continuously with both hands; she could continuously use both feet for operation of foot controls.  (R. 360.)  Regarding postural activities, Dr. Rosenberg found that Plaintiff could occasionally climb ladders or scaffolds, she could frequently climb stairs and ramps, and she could continuously balance, stoop, kneel, crouch, and crawl.  (R. 361.)  Due to COPD and shortness of breath, Dr. Rosenberg concluded that Plaintiff could never tolerate exposure to humidity and wetness, dust, odors, fumes, pulmonary irritants, and extreme cold or heat; she could occasionally tolerate unprotected heights; she could frequently tolerate exposure to moving mechanical parts; and she could continuously tolerate operating a motor vehicle and

12

vibrations.  (R. 362.)  Finally, Dr. Rosenberg found Plaintiff was able to do all nine identified activities.  (R. 363.)

### 3. **State Agency Physical Opinion**

On March 12, 2014, Harshadkumar Patel, M.D., completed a Physical Residual Functional Capacity Assessment after reviewing the record, including Dr. Rosenberg's evaluation and opinion.  (R. 80-82.)  He concluded that Plaintiff was able to perform a range of medium work with postural and environmental limitations.  (*Id.*)  He specifically opined that Plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently; she could sit, stand, or walk for a total of six hours in an eight-hour day; she could occasionally climb ladders/ropes/scaffolds and crawl; she could frequently climb ramps/stairs, balance, stoop, kneel, and crouch; she had to avoid even moderate exposure to extreme cold, fumes, dusts, gases, and poor ventilation; and she had to avoid concentrated exposure to humidity.  (R. 81-82.)  Dr. Patel noted that a report of Plaintiff's post-lobectomy status was needed but he did not believe that her very mild COPD or the lobectomy were issues in her alleged disability.  (R. 82.)  Dr. Patel also noted that his opinion regarding Plaintiff's ability to lift differed from that of Dr. Rosenberg and that opinion had been considered in his assessment.  (*Id.*)

### 4. **Treating Provider Opinion**

CRNP Mary Rock completed a Mental Impairment Questionnaire

(RFC & Listings) on July 16, 2014. (R. 378-83.) Ms. Rock indicated that she first evaluated Plaintiff in August 2012 and Plaintiff received treatment for moderate to severe recurrent depression. (R. 378.) She indicated that Plaintiff's medications of Prozac, Buspar, Neurontin, and Ativan caused sedation and fatigue. (*Id.*) Ms. Rock identified supportive clinical findings to be anhedonia, prolonged sleep, critical self-talk, suicidal ideation, and passivity. (*Id.*) She found her prognosis to be fair. (*Id.*) Ms. Rock identified numerous signs and symptoms including generalized persistent anxiety, seclusiveness, perceptual or thinking disturbances, difficulty thinking or concentrating, and memory impairment. (R. 379.) Regarding the mental abilities and aptitudes needed to do unskilled work, Mr. Rock opined that Plaintiff was unable to meet competitive standards in the following areas: remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; and work in coordination with or proximity to others without being unduly distracted. (R. 380.) She further opined that Plaintiff had no useful ability to function in many areas: maintain attention for two hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an

unreasonable number and length of rest periods; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; and deal with normal work stress. (*Id.*) Ms. Rock did not explain the limitations assessed as requested on the form. (*Id.*) However, in another section of the form, Ms. Rock explained limitations related to mental abilities and aptitude needed to do particular types of jobs, noting that Plaintiff was unable to function even in an unskilled job due to severe depression, medical illness, and social anxiety. (R. 381.) She also found that Plaintiff's mental impairments resulted in the following functional limitations: marked restrictions in activities of daily living; extreme difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompensation within a twelve month period, each of at least two weeks duration. (R. 382.) Ms. Rock checked that the following applied to Plaintiff: "Medically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following"[1]

---

[1] Ms. Rock did not identify which of the three additional requirements was satisfied. (*See* R. 382.)

(*id.*); and "an anxiety related disorder and **complete** inability to function independently outside the area of one's home" (*id.*). Additionally, she believed that Plaintiff would miss more than four days of work a month due to her impairments and her impairment lasted or was expected to last at least twelve months.  (R. 383.)

## C.   *Hearing Testimony*

At the October 13, 2015, hearing before ALJ Burock, Plaintiff testified about symptoms associated with her lung conditions, stating that she had to use her "pump or . . . defibrillator" if she walked a flight of stairs too fast.  (R. 39.)  Plaintiff noted that she had quit smoking nineteen days before the hearing and her lungs felt better since then.  (R. 40-41.)  Plaintiff identified additional physical problems to be sciatic pain for which she did not take medication (R. 45-46) and a hernia which precluded her from picking up more than ten pounds.  (R. 48.)  Plaintiff added that the hernia was diagnosed after her lung surgery and her doctor at Hamilton Health did not want to surgically repair the hernia--he wanted to wait until it got more severe because "[t]hey're afraid to put me under."  (R. 48.)

Regarding mental health issues, Plaintiff testified that she was "pretty much" depressed all the time and her medication helped. (R. 43.)  She affirmed that she suffered from anxiety and said got very anxious when there were lots of people around that she didn't know.  (R. 44.)  Plaintiff added that anxiety medication helped

sometimes but the medication (Xanax) made her tired.  (R. 45.)
Plaintiff clarified that she want to Hamilton Health for therapy
and Holy Spirit for psychiatric care because Hamilton Health did
not have a psychiatrist.  (R. 57-58.)

When asked about physical activity, Plaintiff testified that
she was able to walk two blocks and stand for twenty to twenty-five
minutes before she had to sit down.  (R. 47.)  As noted above,
Plaintiff said she was limited to lifting no more than ten pounds
because of her hernia.  (R. 48.)  Plaintiff reported that her daily
activities included taking care of her dog, cooking, sometimes
going to the laundromat, and some gardening. (R. 49.)  Other
activities included watching TV and reading her bible for ten
minutes in the morning and intermittently through the day.  (R. 55-
56.)  Plaintiff noted that she needed quiet to pay attention when
reading, she was generally able to follow the TV program she was
watching, and she could pay attention to what she was watching for
about an hour.  (*Id.*)  She said she took daily naps, the duration
of which depended on how tired or depressed she was.  (R. 56.)  She
added that she had been taking long naps due to depression but the
recent addition of Wellbutrin to her medication regimen had been
"pepping [her] up a little bit more."  (R. 57.)

Plaintiff testified that she had been active in a small church
for three years and went to weekly services there.  (R. 53-54.)
She also said that she regularly socialized with her friend Nancy.

17

(R. 53.)

ALJ Burock asked Vocational Expert Brian Bierley ("VE") to consider an individual of Plaintiff's age, education, and work experience, who had the residual functional capacity for light work and was "[n]onexertionally[] limited to routine, repetitive tasks, as required by unskilled labor; no public interaction; occasion--which is defined as up to one-third of the workday--ramps and stairs, balance, stoop, kneel, crouch crawl; not even moderate exposure to extreme temperatures, fumes, odors, dust, gases, poor ventilation or humidity." (R. 63.) The VE testified that such an individual could not perform Plaintiff's past relevant work as a home attendant or night auditor. (*Id.*) The VE then identified exemplary unskilled light jobs which the individual could perform: bench assembler and electrical accessories assembler. (R. 64.)

Upon questioning by Plaintiff's counsel, the VE said that no jobs would be available if the person regularly missed work more than a day and a half a month or were off task more than fifteen percent of the workday on a regular basis. (R. 64-65.)

**D.  ALJ Decision**

In his December 2, 2015, decision, ALJ Burock determined that Plaintiff had the severe impairments of COPD, generalized anxiety disorder, major depressive disorder (recurrent, severe), stage 1A adenocarcinoma status post right upper lobectomy, and tobacco use. (R. 20.) He concluded that Plaintiff did not have an impairment or

18

combination of impairments that met or equaled the severity of one of the listed impairments. (R. 21.) Regarding mental impairments, ALJ Burock specifically considered Listings 12.04 and 12.06. (R. 21.) He found that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence, or pace, and she had experienced no episodes of decompensation which had been of extended duration. (R. 21-22.) ALJ Burock assessed Plaintiff to have the residual functional capacity ("RFC") to perform light work except that she could occasionally balance, stoop, kneel, crouch and crawl, she could not have even moderate exposure to extreme temperatures, fumes, odors, dust, gases, poor ventilation or hazards, she could have no public interaction, and she was limited to routine, repetitive tasks. (R. 22.)

Regarding opinion evidence, the ALJ assigned significant weight to Dr. Patel's opinion but limited Plaintiff to light rather than medium work because evidence after March 2014 reflected ongoing complaints of shortness of breath with some chest wall pain. (R. 25.) ALJ Burock assigned different weights to different portions of Dr. Rosenberg's opinion: he assigned very little weight to the opinion that Plaintiff could not perform any lifting based on the statements that she was told not to lift anything greater than five pounds by her surgeon in that this was not an accurate estimate of Plaintiff's longitudinal abilities; and he assigned

partial weight to the rest of the opinion as he found it generally consistent with the objective evidence of record and the opinion of Dr. Patel. (*Id.*)

ALJ Burock assigned limited weight to Dr. Fink's opinion that Plaintiff did not have a severe mental impairment because subsequent records showed otherwise. (*Id.*) He assigned very little weight to CRNP Rock's opinion as the opinion was not rendered by an acceptable medical source and appeared to be a gross overestimate of Plaintiff's limitations when compared to the level and frequency of mental health treatment received and objective findings in the record did not support the limitations. (R. 25-26.)

After finding that Plaintiff was not able to perform her past relevant work, the ALJ determined that jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. 26-27.) Therefore, ALJ Burock concluded that Plaintiff had not been under a disability as defined in the Social Security Act at any time from September 23, 2013, through March 31, 2015, the date last insured. (R. 27.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2] It is necessary for the

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e).

---

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy. (R. 26-27.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

22

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted).  If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result

23

but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or

her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the ALJ erred on the following bases: 1) he improperly based Plaintiff's residual functional capacity ("RFC") on his own lay opinion; 2) substantial evidence does not support the ALJ's RFC assessment; 3) the ALJ erred in his evaluation of Plaintiff's symptoms; and 4) the ALJ erred at step three of the evaluation process by finding that Plaintiff does not meet Listing 12.04.  (Doc. 9 at 1-2.)

### A.  *Lay Opinion*

With her first claimed error, Plaintiff maintains that the ALJ did not fill the void left by his rejection of opinion evidence and "improperly forged ahead to render an independent assessment." (Doc. 9 at 9 (citing *Knier v. Berryhill*, No. 3:16-CV-457 (M.D. Pa. Jul. 5, 2017)).)  Defendant responds that substantial evidence supports the ALJ's evaluation of the opinion evidence and he did not rely on his own lay opinion.  (Doc. 10 at 12-15.)  The Court concludes Plaintiff has not shown that this alleged error is cause for remand.

The Third Circuit Court of Appeals has noted that the Circuit Court

> has repeatedly held that "an ALJ is not free to set his own expertise against that of physicians who present competent medical evidence." *Fowler v. Califano*, 602 F.2d 55 (3d Cir. 1979). *See also Rossi v. Califano*, 596 F.2d 55 (3d Cir. 1979); *Gober v.*

25

> *Matthew*s, 574 F.2d 772, 777 (3d Cir. 1978).
> Indeed, we have previously warned that, "[i]n
> cases of alleged psychological disability,
> such lay observation [by an administrative
> judge] is entitled to little or no weight."
> *Kelly v. Railroad Retirement Bd.*, 625 F.2d
> 486, 494 (3d Cir. 1980) (quoting *Lewis v.
> Weinberger*, 541 F.2d 417, 421 (4th Cir.
> 1976)).  The ALJ could only have reached his
> conclusion by relying solely on his own non-
> expert observations at the hearing--in other
> words, by relying on the roundly condemned
> "sit and squirm" method of deciding
> disability cases.  *See*, *e.g.*, *Freeman v.
> Schweiker*, 651 F.2d 727, 731 (11th Cir.
> 1982); *Aubeuf v. Schweiker*, 649 F.2d 107, 113
> n.7 (2d Cir. 1981).

*Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir. 1983).

This is not a case where the ALJ could only have reached his conclusion by relying on his own lay opinion.  Contrary to Plaintiff's assertion that the ALJ rejected all opinion evidence (Doc. 9 at 9), ALJ Burock gave significant weight to Dr. Patel's opinion but limited Plaintiff to light rather than medium work because evidence indicated that after March 2014 (i.e., after Dr. Patel rendered his opinion) Plaintiff had ongoing complaints of shortness of breath with exertion and some chest wall pain.  (*See* R. 25.)  Further, the ALJ assigned partial weight to Dr. Rosenberg's opinion regarding Plaintiff's ability to sit, stand, and walk with environmental limitations.  (*Id.*)  The only aspect of Dr. Rosenberg's opinion to which ALJ Burock assigned very little weight was the finding that Plaintiff could not perform any lifting, a finding which Dr. Rosenberg noted was based on

Plaintiff's report of what her surgeon had said after surgery rather than on longitudinal evidence (i.e., for a twelve month period) of her lifting abilities and later records. (*Id.*) Plaintiff does not show how this analysis is inconsistent with the record nor does she point to evidence which would limit her exertional capability to less than light work. (*See* Doc. 9 at 8-10; Doc. 12 at 1-2.)

Regarding mental health opinions, ALJ Burock did not reject all opinion evidence but afforded limited weight to Dr. Fink's PRT assessment because he found that records post-dating the opinion supported a conclusion that Plaintiff's symptoms would cause moderate difficulties in maintaining social functioning (particularly with the general public) and moderate difficulties in maintaining concentration, persistence, or pace. (R. 25.) Plaintiff does not point to evidence showing error in these assessments made by ALJ Burock, nor does she point to error in the ALJ's assessment of Ms. Rock's opinion. (*See* Doc. 9 at 8-10; Doc. 12 at 1-2.) Thus, Plaintiff's cursory analysis of this claimed error does not show the case could be remanded on the basis asserted.

**B.   *RFC Assessment***

Plaintiff next asserts that the ALJ erred by failing to include moderate restrictions in concentration, persistence, or pace, and social functioning in the RFC and the hypothetical posed

to the VE.  (Doc. 9 at 10-12.)  Defendant responds that substantial evidence supports the ALJ's RFC assessment.  (Doc. 10 at 15-18.)  The Court concludes Plaintiff has shown error which is cause for remand.

Plaintiff primarily relies on *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2002), for the proposition that limitation to simple, routine, and repetitive tasks does not reflect moderate restrictions in concentration, persistence, or pace.  (Doc. 9 at 10.)  Although Plaintiff's articulation of the issue is vague, the Third Circuit Court of Appeals clearly addressed the issue of the need to include limitations in concentration, persistence, or pace in an RFC assessment or VE hypothetical in *Ramirez*.  372 F.3d at 554.  The Court explained that the limitation to one to two-step tasks identified in the VE hypothetical relied upon by the ALJ did not adequately encompass deficiencies in concentration, persistence, or pace which the ALJ had found: if the plaintiff often suffered from the identified deficiencies and they had been included in the hypothetical, the VE may have changed the answer regarding whether jobs existed in the national economy that the plaintiff could perform.  *Id.*  *Ramirez* added that

> [t]his omission from the hypothetical runs afoul of our directive in *Chrupcala*, that a "hypothetical question must reflect all of a claimant's impairments," *Chrupcala* [*v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)], as well as our statement in *Burns* that "great specificity" is required when an ALJ incorporates a claimant's mental or physical

> limitations into a hypothetical. *Burns* [*v.*
> *Barnhart*, 312 F.3d 113, 122 (3d Cir. 2002)].
> Indeed, the SSA's ruling requires a "more
> detailed assessment" of the claimant's mental
> limitations at step five of the disability
> analysis. *See* SSR 96-8p (July 2, 1996).

372 F.3d at 554-55. *Ramirez* allowed that "there may be a valid

explanation for the omission from the ALJ's hypothetical but such

an explanation was not contained in the record or apparent on its

face. *Id.* at 555.

Defendant responds that *Ramirez* is distinguishable because in

*Ramirez* the claimant's limitations in concentration, persistence,

or pace occurred "often" and here the limitations are considered

moderate. (Doc. 10 at 16 (citing *Ramirez*, 372 F.3d at 548; *Padilla*

*v. Astrue*, No. 10-CV-4968 ES, 2011 WL 6303248, at *10 (D.N.J. Dec.

15, 2011)).) As evidence of the significance of the distinction,

Defendant points to *McDonald v. Astrue,* 293 F. App'x 941, 946-47

(3d Cir. 2008), where a hypothetical limiting an individual to

"simple routine tasks" was found sufficient to account for moderate

limitations in concentration, persistence, or pace. (Doc. 10 at

16.)

The problem with reliance on *McDonald* is twofold. First, the

case is not precedential and the Court of Appeals for the Third

Circuit "steadfastly attempt[s] to discourages District Courts from

relying on nonprecedential opinions." *Jamison v. Klem*, 544 F.3d

266, 279 n.11 (3d Cir. 2008). Second, many courts have explained

why *McDonald* is not persuasive, including this Court in *Jury v.*

29

*Colvin*, Civ. A. No. 3:12-CV-2002, 2014 WL 1028439, at *11 n.21
(M.D. Pa. Mar. 14, 2014).

> The Commissioner relies on a non-precedential opinion, *McDonald v. Astrue*, 293 F. App'x 941 (3d Cir. 2008), to establish a distinction between "moderate" deficiencies and "often" having deficiencies in concentration, persistence, or pace. . . . In *McDonald*, the Third Circuit found that the plaintiff had "moderate" deficiencies in concentration, persistence, or pace, and noted in a footnote that *Ramirez* was distinguishable because the plaintiff in *Ramirez* "often" suffered from deficiencies in concentration, persistence, or pace. *McDonald*, 293 F. App's at 946 n.10. However, the panel did not address the recent change in the functional five-point scale used to assess concentration, persistence, or pace, which changed the term "often" to "moderate" at the third level of the five-point scale. *See Strouse v. Asture*, No. 07-4514, 2010 WL 1047726, at *6 (E.D. Pa. Mar. 19, 2010); *see also Colon v. Barnhart*, 424 F. Supp. 2d 805, 811 (E.D. Pa. 2006) (explaining the changes to the functional five-point scale). Several district courts have thus concluded that "moderate" on the new scale and "often" on the old scale are equivalent. *See Strouse*, 2010 WL 1047726, at *6; *Colon*, 424 F. Supp. 2d at 811; *Dynko v. Barnhart*, No. 03-CV-3222, 2004 WL 2612260, at *5 (E.D. Pa. Nov. 16, 2004) (considering "often" and "moderate" impairments equally on a five-point continuum). Moreover, the court held that the lack of record evidence for the plaintiff's alleged limitations was dispositive to his claim for social security benefits, not the distinction between the "often" suffering from deficiencies or "moderate" deficiencies. *McDonald*, 293 F. App'x at 946. Therefore, the court will apply *Ramirez* to the present case.

2014 WL 1028439, at *11 n.21. As in *Jury*, the Court finds *Ramirez*

applicable to the facts of this case and concludes that the lack of specific consideration of concentration, persistence, or pace in the RFC and hypothetical to the VE is cause for remand.[3]

Because remand is required on this basis and further VE testimony is likely required, Plaintiff's claimed error regarding her moderate limitation in social functioning should also be addressed on remand.  Pursuant to *Rutherford*, 399 F.3d at 554, the hypothetical posed must "accurately convey to the vocational expert all of a claimant's *credibly established limitations*."  (citing *Plummer*, 186 F.3d at 431.)  To the extent ALJ Burock's posed hypothetical included a limitation to "no public interaction" (R.

---

[3]  Further, Defendant's reliance on the ALJ's discussion of concentration, persistence, or pace at step three (Doc. 10 at 17) does not acknowledge that ALJ Burock, citing SSR 96-8p, explained the distinction between his step three evaluation and later steps of the evaluation process: the step three determination is not a residual functional capacity assessment and

> the mental residual functional capacity
> assessment used at steps 4 and 5 of the
> sequential evaluation process *requires a more
> detailed assessment* by itemizing various
> functions contained in the broad categories
> found in paragraph B . . . .  Therefore, the
> following residual functional capacity
> assessment reflects the degree of limitation
> the undersigned has found in the "paragraph
> B" mental function analysis.

(R. 22 (emphasis added.)  The ALJ's paragraph B limitations found at step three included moderation difficulties regarding concentration, persistence, or pace, and social functioning and a more detailed assessment of paragraph B limitations is not found later in the decision.  (R. 22-28.)

63) but did not include his finding that Plaintiff had moderate difficulties in social functioning (R. 22), more is needed, i.e,. the ALJ may further explain the adequacy of the limitation posed in the hypothetical and show how it satisfies the step five burden or pose a different, more inclusive hypothetical to a VE.

## C.  *Symptom Evaluation*

Plaintiff presents several bases for this claimed error, including the misapprehension of the cause of some of Plaintiff's symptoms, the significance of a lack of diagnostic imaging or clinical presentation related to symptoms, consideration of smoking, and assessment of emergency room treatment for mental health.  (Doc. 9 at 12-15.)  Defendant maintains that the ALJ properly evaluated Plaintiff's subjective complaints.  (Doc. 10 at 18.)  The Court concludes that additional clarification regarding some matters raised with this claimed error.

The Third Circuit Court of Appeals has made clear that a reviewing court is to defer to the ALJ's assessment of credibility. *See*, *e.g.*, *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014). *Zirnsak* cited *Diaz v. Comm'r*, 577 F.3d 500, 506 (3d Cir. 2009), for the proposition that "[i]n determining whether there is substantial evidence to support and administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses."  777 F.3d at 612.  *Zirnsak* also made clear that "the ALJ must specifically identify and explain what

evidence he found not credible and why he found it not credible."
*Id.* (citing *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)).

Because the decision under review here was issued on December 2, 2015, SSR 96-7p is the applicable Social Security Ruling pursuant to the October 25, 2017, republication of SSR 16-3p. *See* SSR 16-3p, 2017 WL 5180304, at *1 (Oct.25, 2017). Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p.

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an

underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. *Id.* In so doing, the medical evidence of record is considered along with the claimant's statements. *Id.*

The regulations provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii).

Here ALJ Burock provided multiple reasons for his conclusions regarding Plaintiff's subjective symptoms. (R. 23-25.) For the most part, Plaintiff cherry-picks one among many reasons provided for a finding in an attempt to show error. (*See* Doc. 9 at 13-14.) For example, Plaintiff points to error in the ALJ's notation that

Plaintiff did not require intensive treatment such as emergency room visits for her mental impairments where this statement was made in the context of at least ten observations regarding the reasons ALJ Burock determined these symptoms would not preclude Plaintiff from being able to perform work activity. (*See* R. 24-25.) Similarly, the ALJ's accurate observation that Plaintiff continued to smoke is found at the end of a lengthy analysis of her history of COPD complicated by her history of tobacco use. (*See* R. 24.) Plaintiff references the ALJ's statement regarding the lack of evidence of severe pathology via diagnostic imaging or clinical presentation and SSR 96-7p's prohibition against discrediting symptoms solely because of a lack of medical evidence, but she does not identify how the prohibition was violated here. (Doc. 9 at 13-14.) Because ALJ Burock provided a detailed rationale for his findings in most instances and Plaintiff has not shown error on the three specific bases for error cited above, the Court concludes the claimed errors are not cause for remand.

With this conclusion, Plaintiff's assertion that the ALJ erred in his assessment of the lack of pain medication relative to her inability to lift or walk more than two blocks (Doc. 9 at 13) remains. In his decision, ALJ Burock stated that Plaintiff "testified to extreme limitations, such as an inability to lift greater than 10 pounds or walk more than two blocks, yet she does not require the use of pain medications." (R. 23 (citing

Testimony).)  Close scrutiny of the reasons for discounting these
claimed limitations is warranted in that they are central to the
determination of a claimant's appropriate exertional level when
assessing the RFC.  *See* 20 C.F.R. § 404.1567.  For the reasons that
follow, the ALJ's undermining of these limitations because
Plaintiff did not require the use of pain medication and the
inferential attribution of these limitations to pain requires
further consideration and explanation.

At the October 13, 2015, hearing, Plaintiff testified that she
was unable to lift more than ten pounds "because I have -- I also
have a hernia, and my doctor wants to wait until it gets severe
enough.  They're afraid to put me under again." (R. 48.)  She
added that the hernia was diagnosed after her lung surgery in
November 2013.  (*Id.*)  Although Plaintiff does not identify this
basis for the lifting limitation in her supporting brief (*see* Doc.
9 at 13), because it is the basis she identified at the hearing,
the ALJ should consider it on remand and, if indicated, explain the
basis for rejecting it.[4]

Regarding the inability to walk more than two blocks, the
unclear reasons for the limitation exhibited in the testimony
indicate that the fact that Plaintiff does not require pain
medication may not be relevant in that Plaintiff identified the

---

[4]  At step two, ALJ Burock found that records show Plaintiff
had numerous other medical conditions, including hernia.  (R. 20.)

limitation after the ALJ asked how many blocks she could walk "on level ground, not carrying anything, before you have to stop and sit down because of *shortness of breath, fatigue, weakness, or any other symptoms*." (R. 47 (emphasis added).) The ALJ did not ask the basis for the limitation but Plaintiff followed her response that she could walk two blocks with the notation that she had "metal and six screws holding [her] ankle together." (*Id.*) After asking a few questions about the ankle injury, the ALJ did not further pursue the reasons for Plaintiff's claimed walking limitation. (*Id.*) Therefore, Plaintiff's allegation that she has difficulty walking due to shortness of breath (Doc. 9 at 13) was not directly explored at the hearing and should not be ruled out as a basis for the limitation without further explanation.

**D.  *Step Three Error***

Plaintiff argues the ALJ erred because he concluded that Plaintiff did not meet Listing 12.04. (Doc. 9 at 15-17.) Defendant responds that the ALJ correctly found that Plaintiff did not meet this listing. (Doc. 10 at 22-27.) The Court concludes Plaintiff has not met her burden of showing error on the basis alleged.

In support of the argument that she meets Listing 12.04, Plaintiff relies on Ms. Rock's opinion and her findings that Plaintiff was unable to meet competitive standards and had no useful ability to function in numerous areas and her finding that

Plaintiff had extreme difficulties in maintaining social functioning and concentration, persistence, or pace. (Doc. 9 at 16.) Insofar as the Plaintiff has not shown that ALJ Burock erred in his assessment of Ms. Rock's opinion and his conclusion that it was entitled to very little weight (R. 25), Plaintiff's reliance on it to show that she meets Listing 12.04 does not satisfy her burden of showing error.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly granted and this matter is remanded to the Acting Commissioner for further consideration consistent with this Memorandum. An appropriate Order is filed simultaneously with this action.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: January 29, 2018